# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

SUPERIOR SEAFOODS, INC.,
SUPERIOR SEAFOODS, LLC,
QUALITY FINER FOODS, INC., and
LOUIS E. KEMP,

Civil No. 06-2543 (JRT/AJB)

Plaintiffs,

v.

TYSON FOODS, INC. and
CONAGRA GROCERY PRODUCTS
COMPANY, LLC,

**MEMORANDUM OPINION
AND ORDER ON CROSS MOTIONS
FOR SUMMARY JUDGMENT**

Defendants.

Marcy S. Wallace, Craig A. Goudy, and Charles A. Cox, III, **COX GOUDY MCNULTY & WALLACE, PLLP**, 2929 University Avenue Southeast, Suite 108, Minneapolis, MN 55414, for plaintiffs.

Robert J. Gilbertson and Keala C. Ede, **ROBINS KAPLAN MILLER & CIRESI LLP**, 800 LaSalle Avenue, Suite 2800, Minneapolis, MN 55402-2015, for defendant Tyson Foods, Inc.

John P. Passarelli and Patrick C. Stephenson, **KUTAK ROCK, LLP**, 1650 Farnam Street, Omaha, NE 68102; and Joseph J. Roby, Jr., **JOHNSON KILLEN & SEILER**, 230 West Superior Street, Suite 800, Duluth, MN 55802; for defendant ConAgra Grocery Products Company, LLC.

Plaintiffs Superior Seafoods, Inc., Superior Seafoods, LLC, Quality Finer Foods, Inc., and Louis E. Kemp (collectively, "Kemp") bring this action to set aside a Consent Order entered into before this Court on May 22, 2001. Kemp argues that the Order was either a product of fraud on the court or was entered into by mistake. This Court previously partially denied defendants' motions to dismiss. *Superior Seafoods, Inc. v.*

*Tyson Foods, Inc.*, No. 06-2543, 2007 WL 26325 (D. Minn. Jan. 3, 2007).  Now before the Court are Kemp's motion for partial summary judgment, defendant Tyson Foods, Inc.'s ("Tyson") motion for summary judgment, and defendant ConAgra Grocery Products Company, LLC's ("ConAgra") motion for summary judgment.  For the reasons given below, the Court denies Kemp's motion and grants the motions of both defendants.

## BACKGROUND

In 1985, Louis E. Kemp started Kemp Foods, Inc. ("Kemp Foods"), which made and sold artificial crab products containing surimi, a low-fat, processed fish product.  In 1987, Louis E. Kemp sold his line of surimi-based products to the Oscar Mayer Foods Corporation ("Oscar Mayer") for $4 million.  (Ede Aff., Ex. 17.)  As part of the sale, Kemp agreed "that neither [he], nor any entity in which [he] has an interest, shall in the future market, sell or otherwise distribute any product except as provided in Section 7.6 and 7.7 or any other food or beverage product either at wholesale or retail bearing the name KEMP, KEMP'S, KEMP'S & Design or any variation thereof."  (*Id.*, Ex. 1, § 7.5.)  In Section 7.6, Kemp agreed to cease selling "any products" using the names KEMP, KEMP'S and KEMP'S & Design within nine months.  (*Id.*, Ex. 1, § 7.6.)  Section 7.7 permitted Kemp to distribute products "bearing a composite trademark consisting of the word KEMP or KEMP'S and preceded by one or more additional words the selection of which shall be approved in advance in writing by [Oscar Mayer]."  (*Id*, Ex. 1, § 7.7.)

In 1989, the parties agreed on an amendment to the sale agreement.  (*Id.*, Ex. 3.)  The amendment repeated the requirement that Kemp get Oscar Mayer's written approval

before using "the word KEMP or KEMP'S . . . preceded or followed by one or more additional words." (*Id.*, Ex. 3, § 7.7.)  The amendment added, however, that Kemp was granting Oscar Mayer "the right to use and register the mark LOUIS KEMP, any design marks incorporating LOUIS KEMP and/or LOUIS KEMP SEAFOOD COMPANY in the United States and elsewhere for surimi-based seafood products and such other seafood and fish accessory products within the natural zone of product line expansion." (*Id.*, Ex. 3, § 7.8.)

From 1987 to 1991, Oscar Mayer spent more than $49 million advertising and promoting its products under the Marks. *See Kemp v. Bumble Bee Seafoods, Inc. ("Kemp I")*, No. 96-173, 2002 WL 31185860, at *3 (D. Minn. Sept. 30, 2002).  On August 22, 1991, Kemp executed a bill of sale conveying to Superior Seafoods, Inc. and Superior Seafoods, LLC (collectively, "Superior Seafoods") "any rights" he had retained in his agreement with Oscar Mayer.  (Ede Aff., Ex. 9.)  In 1992, Oscar Mayer, through its parent company Kraft, sold its surimi business to Tyson, who later sold the business to Bumble Bee Seafoods, Inc. ("Bumble Bee").   Bumble Bee was later acquired by ConAgra.  *See id.*  Oscar Mayer and its successors registered trademarks for several variations of KEMP, including LOUIS KEMP and LOUIS KEMP SEAFOOD COMPANY ("the Marks").  (*See* Ede Aff. Ex. 4.)

On August 15, 1995, Kemp sued Oscar Mayer, Kraft, Tyson and others (collectively, "California defendants"), in California state court, complaining that he had been unlawfully deprived of an opportunity to repurchase the Marks and the Kemp Foods Company from Oscar Mayer.  (*See* Ede Aff. Ex. 17.)  In summary, Kemp alleged that

Oscar Mayer had breached the terms of the 1987 sale and engaged in fraud in the course of assigning its rights to the Marks to Tyson, and that Tyson and others had breached his right of publicity in their use of his name.  (*Id*. at 9-19.)  As a remedy, Kemp sought an injunction barring defendants from using the Marks.  (*Id*. at 20.)

A short time later, in October 1995, Kemp began commercial use of the mark LOUIS KEMP on wild rice, chicken and wild rice soup, and wild rice with stir fry vegetables.  Kemp did not seek approval of this use of the KEMP mark pursuant to the terms of his 1987 agreement with Tyson.  In addition, the United States Patent and Trademark Office ("PTO") rejected Kemp's trademark application for use of the LOUIS KEMP mark on precooked wild rice products, on the grounds that it is confusingly similar to the Marks held by defendants.  *Kemp I*, 2002 WL 31185860, at *4.

In December 1995, the California state court dismissed several of Kemp's claims challenging the use of his name, noting that "[t]he defendants are using tradenames/marks, which were sold by Kemp to Oscar Mayer."  (Ede Aff. Ex. 18.) Tyson subsequently sent Kemp a cease and desist letter suggesting that his use of the LOUIS KEMP mark on wild rice products was likely to "create[] a substantial likelihood of confusion as to the source and origin" of those products.  (*Id* at Ex. 14.)

In May 28, 1996 – with several aspects of the California litigation still pending – Kemp brought a new action in Minnesota against Tyson.[1]  (*Id*., Ex. 21.)  Kemp sought a declaratory judgment addressing his right to market wild rice products using the name

---

[1] Bumble Bee was later added as a defendant.

LOUIS KEMP, and brought claims for tortious interference with contract and unfair competition based on lost business arising out of the naming dispute. (*Id*.) In July 1996, Tyson filed an amended answer containing ten counterclaims, including a declaratory judgment claim alleging that Tyson "is the owner of all right, title, and interest in and to the trademarks LOUIS KEMP and LOUIS KEMP SEAFOOD CO. for use on and in connection with food and related products." (*Id*., Ex. 22.)  Tyson also brought counterclaims for trademark infringement and trademark dilution, and numerous claims alleging unfair competition and unlawful trade practices. (*Id*.)

In November 1996, Kemp filed for bankruptcy in California, and the action pending in Minnesota was stayed. (Ede Aff., Ex. 23.) Following extensive negotiations, the California state action and bankruptcy action were settled in 1999, and all of the claims brought in the California action were dismissed with prejudice. (*See* Ede Aff,. Ex. 32.)

After the California settlement, the Minnesota suit resumed and the parties tried to eliminate the issues that were resolved in the California settlement. Because the circumstances of those negotiations are the central dispute in this motion, the Court describes them in detail below.

On August 11, 1999, Eric Prager, an attorney for Tyson, sent a draft consent judgment to Mark Pilon, an attorney for Kemp. (Wallace Aff. Ex. GG at DC0049.) Paragraph 7 of the draft stated that Tyson owned all rights in the Marks and would be granted judgment on its claim for declaratory judgment; paragraph 9 indicated that a number of Kemp's claims would be dismissed with prejudice, including Kemp's request

for a declaratory judgment affirming its right to use the Marks for wild rice products; paragraph 11 directed Kemp to abandon any attempts to register the Marks for use with "seafood or related products"; and paragraph 12 indicated that the "only" remaining issue in the litigation was whether Kemp's use of the Marks on the wild rice products infringed on Tyson's trademark right.  (*Id*. at DC0051-53.)

A lawyer for plaintiffs in the underlying action, Mark Pilon, objected to paragraphs 7 and 11.  (*Id*. at DC0058.)  Pilon explained "in the event that the Court determines the plaintiffs' use of the Louis Kemp mark not to infringe upon Tyson's registration, then the plaintiffs will move forward with their own efforts to gain a registration reflecting their own use of the mark."  (*Id*.)  Pilon raised no objection to paragraphs 9 or 12.  (*Id*.)  In response to Pilon's concerns, Prager indicated that he would remove paragraph 11.  (*Id*. at DC0061.)

Pilon responded to Prager with a letter suggesting additional edits to the draft agreement, to preserve Kemp's argument that "the contractual transfers and consents through which Tyson holds its Louis Kemp marks are limited to the surimi seafood area as contractually defined."  (*Id*. at DC0070.)  Pilon suggested adding a brief clause stating that Tyson's rights "are limited by the terms of the contracts and consents through which Tyson acquired them."  (*Id*. at DC0073.)  However, Pilon did not suggest changes to the (1) statement "Tyson owns all right, title, and interest in and to the Marks"; (2) the grant of Tyson's declaratory judgment claim; (3) the dismissal of Kemp's declaratory judgment claim; or (4) the explicit list of the issues remaining in the case, which at this point merely included Tyson's infringement claim and a tortious interference claim.  (*Id*.)

On August 20, 1999, Prager sent Pilon another draft of the consent judgment, noting it had been amended to "incorporate" Pilon's concerns.  (*Id*. at DC0240.)  While Prager made several of Pilon's suggested changes, he failed to add Pilon's brief clause expressly aligning Tyson's trademark rights with the "contracts and consents" by which Tyson acquired them.  (*Id*. at DC0247.)  Pilon signed the draft consent judgment on August 24, 1999.  (*Id*. at DC0254.)

Prager and Pilon then sought signatures from their clients themselves.   On October 21, 1999, Prager sent the signed consent judgment to Tyson's in-house counsel, and noted that the consent judgment would "eliminate all but Tyson's trademark infringement claim and Kemp's tortious interference with contractual relations claim." (Wallace Aff. Ex. II.)  After Tyson signed the consent judgment, Prager sent the signed consent judgment to Pilon to get a signature from Kemp.  (Wallace Aff. Ex. GG at DC0261.)   Kemp refused to sign the consent judgment, and the parties continued negotiating over its terms.

On February 1, 2000, Pilon sent suggested edits to the consent judgment to Kandis Kahn, another of Tyson's attorneys.  (Wallace Aff., Ex. KK.)  Pilon suggested adding new language to the paragraph that explicitly listed the issues remaining in the litigation. (*Id*.)  Previously, the paragraph had listed as a remaining issue "whether the use by Kemp of the trademark LOUIS KEMP . . . in connection with rice products . . . infringe[s] Tyson's rights in the LOUIS KEMP trademark."  (*Id*.)  Pilon suggested changing it to list "whether Kemp retains the right to use the trademark LOUIS KEMP . . . in connection with the sale of products other than surimi, seafood and other fish accessory products

within the natural zone of product line expansion . . . without infringing Tyson's rights in the LOUIS KEMP trademark[.]" (*Id.*)  A series of additional drafts were exchanged, with some expressly mentioning the dispute over Kemp and Tyson's rights to use the Marks on non-surimi products, and at least one omitting language dismissing Kemp's declaratory judgment claim.  (*See* Wallace Aff. Ex. NN.)  The parties failed to reach a final agreement.

In May 2000, Tyson and Bumble Bee moved to dismiss some of the claims in the Minnesota action, arguing that the claims were precluded by the resolution of the California litigation, or alternatively, that the consent judgment should be enforced because Pilon had signed it.  (Wallace Aff. Ex. QQ.)  Tyson submitted to the Court the version of the consent judgment that Pilon had signed on August 24, 1999.  (*See* Wallace Aff. Ex. SS.)  Tyson and Bumble Bee also filed a motion for summary judgment and a motion for summary adjudication of the claims of tortious interference and unfair competition.  Kemp contends that this briefing deceptively implied that the consent judgment merely covered issues that were precluded as a result of the California settlement.  The parties also filed motions seeking to clarify the parties' respective contractual rights to use the Marks.  *See Kemp v. Tyson Foods, Inc.*, 2001 WL 391552, at *1 (D. Minn. Mar. 31, 2001).

On December 7, 2000, the Court held oral argument on these motions, with Tyson and Bumble Bee represented by Ethan Horwitz, and Kemp represented by John Kelly.  At the start of the hearing, the parties informed the Court that the parties had come to an agreement on the consent judgment.  (*See* Ede Aff., Ex. 43.)  The Court sought

clarification of the scope of the consent judgment, and Horwitz appeared to confirm that Kemp's declaratory judgment claim would not be dismissed.[2]   This exchange also

---

[2] The full exchange is as follows:

THE COURT:  Why don't we clarify exactly what you're seeking in this judgment.  Is it the right to use Louie Kemp for all food products, or is it the right to prevent Louie Kemp from using that name for anything?

MR. HORWITZ:  We are not seeking the right to use Louie Kemp on all food products.  We have no interest in doing that.  Our right to Louie Kemp, under the agreement, were [sic] defined by the California judgment and then, you know, our motion for summary judgment – motion to enter the consent judgment takes care of that.  Our rights are clear.

* * *

THE COURT:  So what this [consent order] means [is] that Tyson would own the trademark to Louis Kemp and Louis Kemp Seafood and all of [Kemp's] claims made in this case against Tyson are dismissed.  Am I correct . . . ?

MR. HORWITZ:  Your Honor, I think if you look at paragraph 10, it shows you the remaining issues left in the case.  One is whether their use of the mark Louis Kemp violates our rights, contractual or trademark rights, and the second is whether Tyson tortiously interfered.  Those are the only two issues left.

THE COURT:  Yeah, and that's – I think what I just said, that all of the plaintiff's claims other than the tortious interference one, are dismissed.

MR. HORWITZ:  And the declaratory judgment.

KELLY:  And the use of the name Louis Kemp for non-surimi based products.

MR. HORWITZ:  There's one claim that they've made, which is a declaratory judgment, that they do not infringe our rights to the – that they do not violate our rights with respect to the mark, contractual or standard trademark infringement.  That is left in the case and that is the subject of one of our motions.  The other one is tortious interference, is the subject of our second motion.

THE COURT:  The noninfringement claim would stay.

MR. HORWITZ:  Correct, Your Honor.

(Footnote continued on next page.)

suggested some possible confusion among the parties, however, about the distinction between Kemp's declaratory judgment claim (which sought to affirm Kemp's right to use the Marks on non-surimi products, and was dismissed in the written consent judgment) and Tyson and Bumble Bee's infringement claims (which sought a declaration that Kemp's use of the Marks on non-surimi products diluted Tyson and Bumble Bee's trademark rights, and not dismissed in the written consent judgment).  (*Id.*)

On March 31, 2001, the Court granted Tyson and Bumble Bee's motion for summary adjudication on Kemp's tortious interference and unfair competition claims, and denied both parties motions as to Kemp's contractual right to use the Marks on non-surimi products.  The Court noted that while Amendment 1 to the 1987 sales contract did not grant Kemp an affirmative contractual right to use the Marks for non-surimi based products, it also did not unambiguously grant Tyson or Bumble Bee a contractual right to prevent Kemp from using the Marks on non-surimi products.  The Court specifically added "[i]t is clear that defendants acquired only a limited right to use and register

_____

(Footnote continued.)

> THE COURT:  And this is all based on a written order from the California Court, is that correct?
>
> MR. HORWITZ:  It's based upon a written order of the California Court combined with another set of orders out of the appellate court.  So there are a whole bunch of documents which we supplied to the court which, together, put all of this in place.
>
> THE COURT:  I see.  Okay.
>
> MR. KELLY:  I have nothing further.

(Wallace Aff. Ex. CCC at 21-22, 27-30.)

LOUIS KEMP and LOUIS KEMP SEAFOOD COMPANY in connection with surimi-based seafood and related products." *Kemp v. Tyson Foods, Inc.*, 2001 WL 391552, at *5 (D. Minn. Mar. 31, 2001).   The Court also specifically noted that the parties had confirmed at the motion hearing that plaintiffs' declaratory judgment claim concerning the parties' contractual rights to the Marks remained to be decided.   *Id.* at *1.   The Court added, however, that the parties had not yet submitted a signed copy of the consent judgment.

On April 13, 2001, Joseph Roby, another Tyson attorney, sent a new draft of the consent judgment to Kemp attorney John D. Kelly.   (*See* Wallace Aff. Ex. HHH.)   This draft stated that Tyson owned all "right, title, and interest" in and to the Marks; that Tyson was granted judgment on its declaratory judgment claim; that Kemp's declaratory judgment claim was dismissed; and that the only issue remaining was whether Kemp's use of the Marks on wild rice products infringed on Tyson's trademark rights.   (*Id.*)

On May 3, 2001, Kelly told Kemp that the draft sent by Roby omitted one limitation that Kelly thought should be included.   (Wallace Aff. Ex. III.)   Kelly believed that the explanation of Tyson's rights should explicitly state that the Marks covered surimi-based seafood products only.   (*Id.*)   The next day, Kelly wrote to Kemp again, to describe a conversation with Kahn.   (Wallace Aff. Ex. JJJ.)   Kelly reported that Kahn refused to "reinstate" the surimi limitation.   (*Id.*)   Kelly noted that Kahn's "willingness to [include the limiting language] was conditioned on your signing the Stipulation.   When that did not happen, she edited out the language."   (*Id.*)   Kelly added "[a]s she points out, however, the registered trademarks are what they are and, as you will recall, they are

limited.   Moreover, the terms of the Judge's recent Order makes clear what the limitations on Tyson's rights are." (*Id*.)  Kelly concluded "[w]hile I might prefer the somewhat more expansive language, I am satisfied that its absence is not material." (*Id*.)

On May 16, 2001, Kelly signed the version of the consent judgment sent by Roby. In a cover letter to the Court, Kelly stated that the consent order was subject to "the Court's determination that 'defendants acquired only a limited right to use and register LOUIS KEMP and LOUIS KEMP SEAFOOD COMPANY in connection with surimi-based seafood and related products.'" (Wallace Aff. Ex. KKK.)  Kahn considered sending a letter of her own in response, but indicated to a another attorney "[t]he bottom line is that the Court's opinion is an Order which says what it says and is the rule of the case.  Similarly, the stipulated consent judgment is an Order which says what is [sic] says and is the rule of the case." (Wallace Aff. Ex. NNN.)  Kahn added "[a]ccordingly, I recommend that we take the high road and ignore Mr. Kelly's letter." (*Id*.)

On May 22, 2001, this Court signed a stipulation and order entering the consent judgment.  Four days later, Horwitz wrote a letter to the Court noting that there was a "slight inconsistency" between the consent judgment and the Court's March 31, 2001, order.  (Wallace Aff. Ex. TTT.)  Specifically, Horwitz noted that the Court's March 31 order stated that plaintiffs' declaratory judgment claim concerning non-surimi products remained at issue, but that this claim had been dismissed with prejudice in the consent judgment.  (*Id*.)

On September 30, 2002, following a bench trial, this Court issued a judgment in favor of Kemp on the remaining infringement and dilution issues.  *Kemp I*, 2002 WL

31185860.   Defendants appealed.   While the appeal of the bench trial judgment was pending, Bumble Bee subsequently introduced a line of smoked salmon (a non-surimi product) under the LOUIS KEMP mark.   (Wallace Aff. Ex. VVV.)   Kemp sought an injunction prohibiting this use of the LOUIS KEMP mark.   On March 30, 2004, the Court issued an order denying Kemp's motion for summary injunction, relying in part on the language of the consent judgment.   *See Kemp v. Tysonfood Group, Inc. ("Kemp II")*, No. 96-173, 2004 WL 741590 (D. Minn. Mar. 30, 2004).   The Court explained that the judgment was "unambiguous and simply cannot be read to include the possibility that the scope of Tyson's marks continued to be limited to surimi-based products.   If such a limitation was intended, it should have been included in the Consent Order."   *Id.* at *5.

On January 27, 2005, Kemp filed a complaint against his former trial counsel, alleging negligence and breach of fiduciary duty.   In short, Kemp argued that the May 22, 2001, consent judgment transferred his right to use the Marks on all food products – including non-surimi products – to Tyson and their successors.   Kemp contends that this was not his intent.   That case is currently stayed pending resolution of this case.   *See Superior Seafoods v. Hanft Fride, P.A.*, Civil No. 05-170 (DWF/FLN).

On February 23, 2005, the Eighth Circuit reversed this Court's judgment on the 2002 bench trial.   *See Kemp v. Bumble Bee Seafoods, Inc.*, 398 F.3d 1049 (8th Cir. 2005). The Eighth Circuit found that a likelihood of confusion exists between the Marks acquired by Oscar Mayer and its successors and Kemp's use of the LOUIS KEMP trademark in connection with his line of wild rice products.   *Id. at* 1057.

On June 20, 2006, Kemp filed this action, seeking to set aside the 2001 consent judgment. Kemp alleges that the actions of defendants' attorneys in connection with the negotiation of the consent judgment constitute fraud on the court. In the alternative, Kemp alleges that the consent judgment was entered into by mistake. Now before the Court are Kemp's motion for partial summary judgment, Tyson's motion for summary judgment, and ConAgra's motion for summary judgment.

## ANALYSIS

### I.    STANDARD OF REVIEW

Summary judgment is appropriate where there are no genuine issues of material fact and the moving party can demonstrate that it is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). A fact is material if it might affect the outcome of the suit, and a dispute is genuine if the evidence is such that it could lead a reasonable jury to return a verdict for either party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986). A court considering a motion for summary judgment must view the facts in the light most favorable to the non-moving party and give that party the benefit of all reasonable inferences that can be drawn from those facts. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

### II.    RULE 60 OF THE FEDERAL RULES OF CIVIL PROCEDURE

The Court first notes that the Federal Rules of Civil Procedure expressly provide for relief from orders and final judgments. Under Rule 60(b), a party may seek such relief for "(1) mistake, inadvertence, surprise, or excusable neglect; . . . (3) fraud . . .,

misrepresentation, or other misconduct of an adverse party; or (6) any other reason justifying relief from the operation of the judgment." Fed. R. Civ. P. 60(b). The rule "provides for extraordinary relief which may be granted only upon an adequate showing of exceptional circumstances." *United States v. Young*, 806 F.2d 805, 806 (8th Cir. 1986).

Rule 60 also includes specific deadlines that apply to motions based on fraud or mistake. Such motions must be brought "not more than one year after the judgment, order, or proceeding was entered or taken." Fed. R. Civ. P. 60(c). Kemp filed this action more than five years after the disputed consent judgment was signed by the Court, and more than two years after this Court interpreted the judgment in a manner that allegedly expanded defendants' trademark rights. In those circumstances, any motion based on fraud or mistake brought under Rule 60(b) would have been time-barred.

Rule 60 adds, however, that the one-year deadline does not limit a court's power to "entertain an independent action to relieve a party from a judgment" or "set aside a judgment for fraud on the court." Fed. R. Civ. P. 60(d)(1), (3). As noted above, Kemp's first claim alleges "fraud on the court," drawing it within this exception. In addition, both of Kemp's claims arise in the context of an "independent action." The Court notes the legal background provided by Rule 60, however, to underscore the extraordinary nature of the relief sought by Kemp.

## III.   FRAUD ON THE COURT (Count I)

"To vacate a motion due to fraud on the court, it is necessary to show a deliberately planned scheme designed to improperly influence the court in its decision."

*Heim v. Comm'r*, 872 F.2d 245, 249 (8th Cir. 1989).   "The cases that recognize such a theory, however, have been careful to differentiate fraud on the court from fraud against individuals."   *Id.*   Courts find fraud on the court only where "egregious" misconduct is "directed to the court itself, such as bribery of a judge or jury or fabrication of evidence by counsel."   *In re Coordinated Pretrial Proceedings in Antibiotic Antitrust Actions*, 538 F.2d 180, 195 (8th Cir. 1976); *see also Oxxford Clothes XX, Inc. v. Expeditors Int'l of Wash., Inc.*, 127 F.3d 574, 578 (7th Cir. 1997) (explaining that fraud on the court involves "conduct that might be thought to corrupt the judicial process itself, as where a party bribes a judge or inserts bogus documents into the record"); *Broyhill Furniture Indus., Inc. v. Craftmaster Furniture Corp.*, 12 F.3d 1080, 1085-86 (Fed. Cir. 1993) (collecting cases showing that "fraud on the court" does not arise from fraud between parties, but rather involves a corruption of the impartial functions of the court itself).   Moreover, fraud on the court must be supported by clear, unequivocal, and convincing evidence.   *In re Antibiotic Antitrust Actions*, 538 F.2d at 195.

In his response brief, Kemp lists the following alleged misrepresentations made by defendants to the Court:  (1) indications in the August 1999 scheduling order submitted by Prager to the Court that the consent judgment (a) merely removed issues that had been resolved in the California litigation, and (b) was agreed to by the parties; (2) Prager's statements in an August 2000 affidavit indicating he had accepted all of Pilon's "substantive changes" suggested on August 19, 1999, and implying that the consent judgment had merely removed issues resolved in California; (3) further implications in defendants' 2000 motion papers implying that the consent judgment merely removed

issues resolved in California; (4) Horwitz's statements in the December 7, 2000, motion hearing concerning the scope of the consent judgment; and (5) Horwitz's letter to the Court noting the "slight inconsistency" between the consent judgment and this Court's prior interpretation of the 1987 sale agreement, when this inconsistency was significant. (Docket No. 192 at 15-16.)[3]

Regardless of whether any of these statements by defendants accurately reflected the state of affairs, however, the Court fails to see how they constitute a fraud **on the court**. The critical judgment in this case was jointly negotiated and signed by the parties. While the Court inquired as to the scope of that judgment at the hearing and reviewed all of the documents submitted by the parties, there simply was never a moment where it was necessary for the Court to rely on those representations in an exercise of judicial discretion. As is evident from the summary of the record provided above, the lengthy procedural history in this case – including the multiple proceedings in California – left the parties with subtle issues to consider as they sought to narrow this action to the surviving claims. The Court would expect that this task also involved considerations of efficiency and litigation strategy. Kemp has offered no explanation for why, in those circumstances, this Court would have looked behind the parties' stipulated consent judgment to assess whether Kemp had prudently safeguarded his interests. In short, it was well within Kemp's rights to determine which claims he wanted to continue to

---

[3] Kemp lists numerous other examples of alleged dishonesty between the parties. As noted above, however, Kemp's claim is for fraud *on the court*. None of Kemp's additional fraud allegations go further in demonstrating interference with the judicial process itself.

litigate, and the burden of ensuring that the consent judgment reflected his wishes fell on Kemp and his attorneys.[4]   Nothing communicated to the Court impacted its decision about whether to enter the consent judgment, and, accordingly, nothing in the record is legally sufficient to demonstrate a fraud on the court.

In sum, regardless of whether anything that occurred between the parties in this case rises to fraud – which this Court doubts, in light of the clarity of the consent judgment and the lengthy, explicit negotiations over the disputed provisions[5] – nothing that occurred here corrupted the Court's decision-making, or could otherwise be plausibly construed as a fraud on the court.   *See In re Coordinated Pretrial Proceedings in Antibiotic Antitrust Actions*, 538 F.2d at 195 (noting that fraud on the court must be directed to the court itself).   Accordingly, Kemp's claim for fraud on the court is denied.

---

[4] The Court adds that Kemp could make no claim that defendants committed a fraud through the act of submitting the consent judgment to the Court.   As the parties' correspondence demonstrates, they actively negotiated over the disputed provisions over approximately 21 months.   In addition, Kelly's May 3, 2001, letter demonstrates that he was carefully considering the final draft of those provisions just before signing the agreement.   At that point, Kemp could have expressed any objections to the agreement by not signing it.   In those circumstances, the submission of the consent judgment to the Court does not even approach the type of egregious misconduct necessary to support a claim for fraud on the court.

[5] The Court also notes that some misunderstanding was plausible in this context, in light of the conceptual overlap between the declaratory judgment claims and the noninfringement claim that remained in the case.   Had Kemp prevailed on defendants' noninfringement claim, the declaratory judgment claims may well have been unnecessary, because defendants would presumably have lacked a basis for preventing Kemp from using the Marks on wild rice products.

## IV.     MISTAKE (Count II)

Both parties also argue they are entitled to summary judgment on plaintiffs' "mistake" claim.  Parties may bring such a claim in an independent action "only to prevent a grave miscarriage of justice."  *See United States v. Beggerly*, 524 U.S. 38, 47 (1998); 11 Charles Alan Wright, Arthur R. Miller, and Mary Kay Kane, Federal Practice and Procedure § 2868 (2d ed. 1995).  Generally, a plaintiff must "(1) show that they have no other available or adequate remedy; (2) demonstrate that movants' own fault, neglect, or carelessness did not create the situation for which they seek equitable relief; and (3) establish a recognized ground – such as . . . mistake – for the equitable relief." *Tibbetts v. President and Fellows of Yale Coll.*, No. 05-5780, 2008 WL 5273421, at *1 (2d Cir. Dec. 19, 2008).

In support of this claim, Kemp argues that none of the attorneys involved in the drafting of the consent judgment intended to expand defendants' rights.  Defendants respond that the critical language of the consent judgment is clear on its face, that Kemp had 21 months to study it, and that there is no evidence that anyone failed to understand the consent judgment's effect.  Defendants further contend that Kemp has failed to demonstrate he was free of fault or negligence.

The Court agrees that there is insufficient evidence in the record to satisfy the heightened burden applicable in an independent action alleging mistake.  As set forth above, there were multiple provisions in the final draft of the consent judgment that touched on Kemp's disputed trademark rights.  One provision indicated that "Tyson owns **all right, title, and interest** in and to the LOUIS KEMP Marks"; another expressly

dismissed Kemp's declaratory judgment claim; and a third expressly stated that Tyson's infringement claim was the only issue remaining in the litigation.  (Ede Aff. Ex. 40, ¶¶ 7, 9, 11) (emphasis added).  This Court has since described these provisions as "very clear," *Kemp I*, 2002 WL 31185860, at *5 (addressing the list of issues remaining in the case), and "unambiguous."  *Kemp II*, 2004 WL 741590, at *5 (noting that the judgment "simply cannot be read to include the possibility that the scope of Tyson's marks continued to be limited to surimi-based products").  Kemp had approximately 21 months to consider this unambiguous language and negotiate for changes.  The record demonstrates that these negotiations were extensive, and frequently focused specifically on the disputed trademark issues.  Most significantly, Kelly's May 3 letter to Kemp – written just weeks before he signed the final draft – demonstrates that he was carefully reading the disputed, unambiguous language and "prefer[red]" stronger provisions for Kemp, but nonetheless recommended agreeing to the judgment.  (Wallace Aff. Ex. JJJ.)  Finally, Horwitz's post-judgment letter explicitly raised the now-controversial provisions, giving Kemp an opportunity to raise any concerns in a motion brought under Rule 60.  He did not do so.  In those circumstances, the Court concludes that Kemp cannot, as matter of law, meet the heavy burden of demonstrating that he was without fault for his circumstances, or that this nearly eight-year-old agreement was entered into by mistake.

Kemp also argues that he is entitled to set aside the judgment because Kelly lacked his authorization to enter into the consent judgment.  The Eighth Circuit has held that "a judgment entered upon an agreement by the attorney may be set aside on affirmative proof that the attorney had no right to consent to its entry."  *See Surety Ins. Co. v.*

*Williams*, 729 F.2d 581, 582-83 (8th Cir. 1984).   However, the Eighth Circuit later elaborated on the limitations of this principle in *Heim*.   872 F.2d at 248-49.   There, the Eighth Circuit explained that in *Williams*, "the clients were completely unaware of their attorney's unauthorized conduct concerning settlement, which brought the litigation to an end."   *Id*. at 248.   The Court added that in other cases where Courts had set aside judgment because of an attorney's negligence, the attorneys had "constructive[ly] disappear[ed]," by neglecting to even respond to summary judgment motions.   *Id*.   In sum, the Eighth Circuit explained that an attorney must engage in "extreme misconduct" to justify setting aside a settlement on this basis.   *Heim*, 872 F.2d at 248-49.   In *Heim* itself, the Court went on to reject the plaintiff's claim, because the attorney was authorized to represent a client in the critical proceeding, and "it [was] only the manner in which he did so that le[d] to the . . . claim."   *Id.* at 248.

Here, it is apparent based on the record summarized above that this case does not fall under the limited principle explained in *Heim*.   Kelly was plainly authorized by Kemp to represent him in negotiations of the consent judgment.   Moreover, Kelly's May 3 letter kept Kemp apprised of developments in those negotiations, and specifically mentioned the parties' disagreement over the final language concerning the surimi limitation.   In those circumstances, any misunderstanding between Kelly and Kemp over

the content of the judgment does not rise to the "extreme misconduct" required in *Heim*

and evident in *Williams*.[6]  Accordingly, Kemp's claim for mistake is dismissed.

## ORDER

Based on the foregoing, all the files, records, and proceedings herein, **IT IS**

**HEREBY ORDERED** that:

1.    Plaintiffs' Motion for Partial Summary Judgment [Docket No. 153] is

**DENIED**.

2.    Tyson Foods, Inc.'s Motion for Summary Judgment [Docket No. 161] is

**GRANTED**.

3.    ConAgra Grocery Products Company, LLC's Motion for Summary

Judgment [Docket No. 163] is **GRANTED**.

**LET JUDGMENT BE ENTERED ACCORDINGLY.**

DATED:  March 31, 2009                      _____s/ John R. Tunheim_____
at Minneapolis, Minnesota.                        JOHN R. TUNHEIM
                                                United States District Judge

---

[6] The Court notes that this conclusion should not be construed as an assessment of the merits of Kemp's malpractice action.